**John I. MORRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 82–63.

District of Columbia Court of Appeals.

Argued July 8, 1983.

Decided Nov. 3, 1983.

Martin S. Echter, Washington, D.C., for appellant.

Joseph Michael Hannon, Jr., Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell and Mark J. Biros, Asst. U.S. Attys., Washington, D.C., appeared on the brief, for appellee.

Before NEWMAN, Chief Judge, and FERREN and BELSON, Associate Judges.

BELSON, Associate Judge:

Appellant was charged with first-degree murder, while armed, of James Bowens, D.C.Code §§ 22–2401 (1981), –3202 (1981 and 1983 Supp.), and with carrying a pistol without a license, *id.* § 22–3204 (1981). Following a jury trial he was found guilty of manslaughter while armed, *id.* §§ 22–2405, –3202 (1981), and carrying a pistol without a license. On appeal, he contends that the trial court erred in: 1) failing sua sponte to restrict the government's cross-examination of appellant's character witness; 2) denying appellant's motion to suppress his confession, and 3) failing to instruct the jury on involuntary manslaughter. Finding no error, we affirm.

I

At trial Harold Bullock testified on appellant's behalf as a character witness. Bullock testified that he had known appellant for approximately 12 years, and that appellant enjoyed a good reputation for peace and good order. On cross-examination, the

government asked Bullock whether he had heard that appellant had been: 1) convicted in 1974 of carrying a pistol without a license; 2) arrested in 1972 for assault with a dangerous weapon; 3) arrested in 1966 on charges of assault and assault with a dangerous weapon; 4) arrested in 1962 for assault with a dangerous weapon (gun) and carrying a pistol without a license, and 5) arrested in 1950 for assault with a dangerous weapon. Bullock responded that he was aware of the 1974 conviction and the 1972 arrest, but was unaware of the earlier arrests, which had occurred before he knew appellant. As a part of its general charge to the jury, the court gave an appropriate instruction concerning the limited purpose for which such examination was permitted. Although defense counsel did not register any objection to this line of questioning at trial, appellant now contends that the trial court committed plain error in failing to restrict, sua sponte, questioning regarding the pre-1972 arrests, which had taken place before Bullock became acquainted with appellant.

As appellant acknowledges, once a criminal defendant elects to put his character in issue by presenting a witness who testifies to the defendant's reputation regarding one or more character traits, the prosecution may, on cross-examination, seek to test the witness' knowledge of the defendant's community reputation regarding the trait or traits in issue. *See, e.g., Michelson v. United States,* 335 U.S. 469, 482–83, 69 S.Ct. 213, 221–22, 93 L.Ed. 168 (1948); *United States v. Lewis,* 157 U.S.App.D.C. 43, 48–50, 482 F.2d 632, 638–39 (1973). In an effort to test the foundation and reliability of the witness' direct testimony it is permissible for the prosecutor to ask whether the witness has heard of particular events, including arrests and convictions of the defendant, which are inconsistent with defendant's enjoying a good reputation regarding the character trait or traits to which the witness has testified. *See, e.g., Lewis, supra,* 157 U.S.App.D.C. at 49, 482 F.2d at 638. The purpose of this type of

cross-examination is not to show either the defendant's bad character or his criminal propensity. The defendant is entitled to have the jury instructed regarding the limited purpose for which such cross-examination may be considered. *See, e.g., Awkard v. United States,* 122 U.S.App.D.C. 165, 167, 352 F.2d 641, 643 (1965).

Nevertheless, impeachment of character witnesses has long been recognized as presenting the danger of undue prejudice to criminal defendants even where, as here, an appropriate limiting instruction is given. *See, e.g., Michelson, supra,* 335 U.S. 469, at 479–80, 484–86, 69 S.Ct. 213 at 220–221, 222–24. Thus, in *Awkard, supra,* the United States Court of Appeals for the District of Columbia Circuit noted that:

> The use of cross-examination of a character witness to show [a] defendant's prior arrests has been much criticized but widely practiced. We do not reverse this long practice at this time. We do, however, urge the trial judges to confine the use of such cross-examination to those situations in which it is highly relevant to establish a character witness' reliability; and even in those situations, to exercise their discretion and exclude the cross-examination where prejudice outweighs probative value.

122 U.S.App.D.C. at 170, 352 F.2d at 646 (footnote omitted). The *Awkard* court stressed that it was by no means automatic that once a defendant "opens the door" by putting an aspect of his character in issue, the prosecution must necessarily be permitted to impeach the character witness by asking whether he has heard of the defendant's past arrests and convictions: "even though the defendant has opened the door, the trial judge is to decide what passes through." *Id.* 122 U.S.App.D.C. at 168, 352 F.2d at 644. The Supreme Court has emphasized that "[w]ide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse." *Michelson, supra,* 335 U.S. at 480, 69 S.Ct. at 221.

■ As noted in *Awkard,* the exercise of the trial court's discretion can be informed by conducting a bench conference to explore the basis for the prosecutor's questions and to weigh considerations of prejudice and probative value. *Awkard, supra,* 122 U.S.App.D.C. at 170 n. 14, 352 F.2d at 646 n. 14; *see also Michelson, supra,* 335 U.S. at 481, 69 S.Ct. at 221; *Johnson v. United States,* 373 A.2d 596, 597 (D.C.1977). Appellant contends that in the case at hand the trial court's failure to conduct, sua sponte, such a hearing and to exclude government questioning relating to arrests that predated the character witness' acquaintance with appellant amounted to plain error. We disagree.

■ Although, as indicated above, the trial court enjoys broad discretion to limit or, in appropriate circumstances, to exclude cross-examination concerning a character witness' awareness of a defendant's past arrests, the trial court's exercise of discretion must in some fashion be invoked. In recognition of the risks that attend criminal defendants' use of character witnesses, defense counsel have been urged to advise the trial court, either before trial or before the character witness testifies, of their intention to call a character witness. *See, e.g.,* 1A Criminal Defense Techniques § 27.-02[2][a] (S. Bernstein ed. 1983); 2 Criminal Practice Institute, Trial Manual 21.117 (1981 ed.). In this manner defense counsel can inform the trial court, outside the jury's presence, of the specific character trait or traits that the defense contemplates placing in issue, and learn whether the prosecution would seek to rebut such favorable reputation testimony by asking the character witness whether he has heard of past arrests that are inconsistent with the favorable character trait or traits that might be placed in issue.

Such a procedure offers several advantages. For example, it allows the trial *court to exercise* informed discretion regarding the scope to be permitted the prosecution's contemplated rebuttal. *See gen-* erally *United States v. Lewis, supra,* 157 U.S.App.D.C. at 54–55, 482 F.2d at 643–44 (only where trial court knows how much ground would be traversed by the offering of good character can court define areas that may be covered on rebuttal). In the exercise of its discretion, the court can then determine whether the prosecution's proposed line of rebuttal has a factual basis, would be relevant to the character trait in issue, and would not be unduly prejudicial. Thus, the court could determine whether inquiry into certain past arrests should be limited or wholly barred. *See generally id.* at 53, 482 F.2d at 642.

■ The trial court can also require the prosecution, where appropriate, to frame a question in a manner that excludes unduly prejudicial details. *Shimon v. United States,* 122 U.S.App.D.C. 152, 157, 352 F.2d 449, 454 (1965). Voir dire may reveal that the witness has additional information concerning the previous event or arrest that tends to offset its adverse impact on defendant's reputation. If so, the trial court should consider allowing the witness to testify concerning such additional information. *See, e.g., id.* Once defense counsel is apprised of the nature of the cross-examination the trial judge will permit, counsel is in a position to decide whether, as a tactical matter, the defense should proceed with or abandon the plan to use the character witness.

■ In this case, however, appellant's trial counsel did not invoke the trial court's discretion. This being the case, the question before us is whether the trial court's failure to intervene was so clearly prejudicial to appellant's substantial rights as to jeopardize the very fairness and integrity of the trial. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). On the record before us and in consideration particularly of the strength of the government's case, we cannot conclude that the error

complained of, if error at all, rose to that level.[1]

## II

Appellant's second contention is that the trial court erred in denying his motion to suppress his confession. At the time of his arrest appellant was advised of his *Miranda* rights, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and stated that he understood those rights. He did not explicitly invoke or waive either the right to remain silent or the right to have counsel present during questioning, and the arresting officers asked appellant no questions.

After appellant was transported to the Homicide Office he was placed in an interrogation room. Detective Clayton Bagley, who had been informed that appellant had been advised of his rights, entered the room. After appellant and Bagley exchanged greetings, appellant spontaneously confessed to killing Bowens.[2] Appellant contends that the trial court erred in failing to suppress this confession because: 1) under the circumstances of this case, appellant's silence following receipt of *Miranda* warnings (*i.e.,* his failure explicitly to in-voke or waive his rights) constituted an invocation of both the right to counsel and the right to silence, and 2) the government failed to demonstrate that thereafter appellant made a knowing and intelligent waiver of those rights. We deem it unnecessary to determine whether appellant's silence constituted an invocation of his *Miranda* rights[3] or whether he subsequently waived those rights. It is unnecessary to reach those issues because regardless of whether appellant had invoked his right to remain silent, his confession was not the product of custodial interrogation.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court noted that the procedural safeguards set forth in *Miranda v. Arizona, supra,* are required not when a suspect is merely taken into custody, but rather when a suspect in custody is subjected to interrogation. 446 U.S. at 300. The *Innis* Court then explained that for *Miranda* purposes "interrogation" occurs

[w]henever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" ... refers not only

---

1. We are similarly unpersuaded by appellant's alternate argument that he was deprived of the effective assistance of counsel by reason of trial counsel's failure to: 1) request a bench conference regarding the permissible scope of character cross-examination, and 2) seek to rehabilitate the character witness by attempting to elicit on redirect the mitigating circumstances that allegedly surrounded the 1972 arrest. The decision to use a character witness is essentially a tactical decision. *See generally Michelson, supra,* 335 U.S. at 478–80, 69 S.Ct. at 219–21. We have repeatedly recognized that counsel's tactical decisions should not be measured by their success at trial, *see, e.g., Tillery v. United States,* 419 A.2d 970, 972–73 (D.C.1980), and that trial counsel's tactical errors will rise to the level of constitutional ineffectiveness only when they are so gross as to blot out the essence of a substantial defense. *See, e.g., id.* at 972. On the record before us we must reject appellant's claim that trial counsel's presentation of good character evidence blotted out appellant's claim of self defense. Indeed, the fact that the jury acquitted appellant of murder suggests that the jurors may have believed some aspects of appellant's defense.

2. Following this confession Bagley left the interview room and returned with a typewriter and the forms necessary for taking a written statement. At this point appellant refused to give a written statement because he did not have an attorney. Bagley then completed a P.D. 163 Offense Report and asked appellant what had happened to the gun that had been used to kill Bowens. Appellant replied that he had thrown it into a sewer. The trial court granted appellant's motion to suppress this statement, which was made in response to questioning that occurred after appellant invoked his right to counsel. Thus, the admissibility of this statement is not an issue on appeal.

3. We note, however, that since the right to counsel must be expressly asserted, silence in the face of *Miranda* warnings would not normally constitute an invocation of this right. *See, e.g., McClinnahan v. United States,* 454 A.2d 1340, 1352 (D.C.1982) (Ferren, J., dissenting). At most, then, appellant's silence might arguably have constituted an invocation of the right to silence.

to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.

*Id.* at 300–01, 100 S.Ct. at 1689 (footnote omitted). Under *Innis* the determination of whether words or actions of the police are reasonably likely to elicit an incriminating response is measured primarily not by the intent of the police, but by how police action would reasonably be perceived by the suspect. *See id.* at 301, 100 S.Ct. at 1689. Thus, the term "interrogation" encompasses only "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response," *id.* at 302, 100 S.Ct. at 1690 (emphasis in original; footnote omitted), and the police will not be held accountable for unforeseeable results of their words or actions, *id.* at 301–02, 100 S.Ct. at 1689–90.

Under the *Innis* test we must conclude that no interrogation occurred before appellant's confession. There is nothing in the record which suggests that Detective Bagley should have foreseen that a brief exchange of commonplace greetings would prompt appellant to make an inculpatory statement. This being the case, appellant's confession cannot be regarded as the product of an interrogation, and hence the trial court did not err in denying appellant's motion to suppress the confession.

### III

Appellant's final claim of error relates to the trial court's instruction to the jury. Although the trial court had agreed to instruct the jury on both voluntary and involuntary manslaughter, the court omitted the latter instruction from its charge. At the conclusion of the charge appellant's trial counsel made no objection. He also expressed his satisfaction with the jury verdict form which made no reference to involuntary manslaughter. Appellant now asserts that the omission of an instruction on

involuntary manslaughter amounted to plain error. We disagree.

Super.Ct.Crim.R. 30 provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The rule requires timely exceptions with respect to final jury instructions in order to provide the trial court with an opportunity to correct errors and omissions. *See, e.g., Johnson v. United States,* 387 A.2d 1084, 1089 (D.C.1978) (en banc). In the absence of such a timely objection, appellant bears a heavy burden when, on appeal, he challenges instructions in which he acquiesced at trial. *See, e.g., United States v. Dixon,* 135 U.S.App.D.C. 401, 403, 419 F.2d 288, 290 (1969) (per curiam). In these circumstances reversal is appropriate only where there is plain error affecting substantial rights. *See, e.g., Love v. United States,* 138 A.2d 666, 667 (D.C.1958). Voluntary and involuntary manslaughter carry the identical maximum sentence, *see* D.C.Code § 22–2405 (1981). In imposing sentence, the trial judge undoubtedly took into account the nature of the particular conduct involved, as well as the identity of the offense for which appellant was convicted. While, as appellant argues, it is reasonable to assume that there would be some degree of difference between the collateral consequences which may attach to conviction for voluntary as opposed to involuntary manslaughter, we conclude that the trial court's charging error did not deprive appellant of substantial rights.

*Affirmed.*

NEWMAN, Chief Judge, dissenting:

This case illustrates the irrational framework described in *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The majority fails to address this quirk and therefore I must respectfully dissent. Pursuant to what the *Michelson* Court itself described as a "grotesque

framework" a witness may not testify about his own opinion of the defendant, an opinion arrived at by independent observation of and personal interaction with the appellant. *Michelson,* 335 U.S. at 477, 69 S.Ct. at 219. Rather the witness in his role as a reporter of the community sentiment, may only "summarize what he has heard in the community" or testify "as to the shadow [the appellant's] daily life has cast in the neighborhood." *Id.* at 477, 69 S.Ct. at 219. The witness is placed in the anomalous position of testifying about what he perceives the community to feel, a community which may be composed of persons who are less well acquainted with the appellant and not what he knows as a fact.

Thus, it would have been error to ask Harold Bullock if he was personally aware of a specific bad act of the appellant. It was, however, permissible, pursuant to this nonsensical framework to question Bullock if he had heard about specific events that predated his friendship with the appellant. The *Michelson* Court elected not to alter this illogical system, noting that "to pull one misshapen stone out of the grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a national edifice." *Michelson, supra,* 335 U.S. at 486, 69 S.Ct. at 224. I submit that the misshapen stone condemns the entire structure. It is long past time for us to build a new one.